**FILED**

JUN 2 6 2008

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD JOSEPH FINLEY | No. 07-cv-01939-DLJ EFB |
| Plaintiff, | No. 98-cr-00460-DLJ |
| vs. | **ORDER** |
| UNITED STATES OF AMERICA | |
| Defendant. | |

On July 11, 2007, Richard Joseph Finley (Finley) filed a claim for unjust conviction and imprisonment in the United States Court of Federal Claims, pursuant to 28 U.S.C. § 1495. At the direction of that Court Finley filed a request for a Certificate of Innocence with this Court, pursuant to 28 U.S.C. § 2513, on July 26, 2007.

Based upon extensive briefing and multiple appearances before this Court, Finley has now presented a full evidentiary record and relevant arguments in support of his request. The United States has been given an equal opportunity to present evidentiary material and relevant argument in response to his request. Both parties have indicated to the Court that they have no further evidence or argument that they wish the Court to consider on the matter. Having considered the evidentiary record, the briefs and the oral arguments presented by both

parties, and the applicable law, the Court DENIES the request by

Finley for a Certificate of Innocence.

## FACTUAL BACKGROUND

In an opinion published August 20, 2002, the Ninth Circuit

summarized the factual background of this case as follows:

> Finley owned a law bookstore and ran a bar review
> course for students of non-accredited law schools.  In
> 1992, Finley began looking for investors to assist him
> in opening a chain of approximately twenty bookstores
> across the United States.  Finley could not obtain
> traditional bank financing because of a dispute he had
> with the IRS over a large tax claim.
>
> In November 1995, a customer mentioned that he had
> attended an investment seminar in Montana run by Leroy
> Schweitzer.[1]  Inspired by this suggestion, on December
> 22, 1995, Finley went to Schweitzer's farmhouse in
> rural Montana to attend the so-called investment
> seminar.  Schweitzer explained that he possessed
> recorded liens against Norwest Bank of Montana, other
> banks, and individuals, and that he could draw on these
> accounts by issuing negotiable instruments.
>
> At the conclusion of the seminar, each attendee
> received a five-minute audience with Schweitzer to
> explain the attendee's needs.  When he met with
> Schweitzer, Finley explain his business plan to open a
> chain of bookstores.  Finley also told Schweitzer that
> he owed the IRS about $180,000 and that he owed a
> mortgage on his condominium with Great Western Bank.
>
> Schweitzer gave Finley several documents that
> looked like financial instruments and were entitled,
> "Comptroller's Warrants" and "Certified Banker's
> Checks."  Schweitzer made one document payable to
> Finley and the Bank of America for $6,125,000, Finley's
> estimate of the cost of starting his bookstore chain.
> Schweitzer made the second document out to Finley and
> Great Western Bank for $150,000, or about twice the
> remaining amount Finley owed on his mortgage.  The
> third instrument named the IRS and Finley as payees for
> $360,000, twice the amount Finley owed in taxes.
> Although nothing existed in writing, Finley understood
> that Schweitzer would receive thirty-five percent of
> the profits from the bookstores.

2

Finley returned to Sacramento, California with the documents and prepared to open his new bookstores. He attempted to deposit the $6 million document with the Bank of America in late December 1995 and again in August 1996. Finley gave the Bank of America documents to an officer who had handled Finley's business accounts for several years. The bank began processing the instrument, but it was returned marked "fictitious check" with a separate notice that indicated "please resubmit when corrections are made." The bank also contacted the post office and received a "fraud alert" addressing similar instruments from Schweitzer. The bank gave a copy of the alert to Finley. Nonetheless, Finley attempted to negotiate the instrument a second time in August 1996. This time Finley told the bank to send it to a designated address, but the item came back unpaid again.

Similarly, on January 2, 1996, Finley attempted to use the $152,000 document to pay off his real estate mortgage with Great Western Bank. Finley included a note indicating the failure to refund the excess amount would constitute criminal conversion. Great Western did not negotiate the instrument because the bank had prior knowledge of fraud alerts regarding Schweitzer instruments.[2]

On January 5, 1996, the chief of the fraud section of the Office of the Comptroller of the Currency wrote Finley stating that the Schweitzer document was "not a valid obligation of the federal government; the special account number is not an account for redemption of payment of such an instrument; the format is not one used by the federal government" and advised Finley to contact the FBI.

Undeterred by this information, Finley mailed the $360,000 document to the IRS Center in Ogden, Utah on January 17, 1996. Finley included a letter requesting "immediate refund for overpayment" in the amount of $180,000. The IRS did not credit the amount to Finley's balance because of its prior knowledge of Schweitzer's instruments. The IRS had received more than two hundred requests for refunds totaling $64,000,000 and IRS workers knew that no refunds should be issued.[3] Finley submitted the IRS document on a total of three separate occasions.

After determining that the IRS and the banks would not honor his documents, Finley embarked on an eight-month quest to learn why the government agencies would not honor what he believed to be valid financial instruments. Finley contacted in person or via mail,

3

facsimile, or telephone several state and federal agencies in an attempt to learn how to negotiate the instruments. Every response indicated that the instruments were the subject of a fraud alert, deemed without value, and should not be honored.

In mid-1996, Finley prepared a "media packet" detailing his efforts to cash the instruments. He entitled the document "Robin Hood and the 9 Hoods" and portrayed various government officials as "bad guys" for not cashing the documents. He distributed this packet to numerous network news programs and national newspapers. No media responded to his packets.

In April 1996, the FBI arrested Schweitzer and others, but not Finley, on multiple charges of fraud based on Schweitzer's seminars and instruments. Around this time, Finley ceased his pursuit to have the instruments honored. In June 1998, Finley testified at Schweitzer's trial in Montana. In his testimony he stated that the government had not prosecuted him for attempting to cash the instruments. This trial resulted in a hung jury. Prior to his testifying in the second trial of Schweitzer in October 1998, the government notified Finley that it would indict him. A grand jury formally indicted Finley on November 6, 1998.

[1]    Schweitzer led a group of people calling themselves the "Montana Freemen." Among other things, Schweitzer gave seminars on his version of the "common law." At the conclusion of these seminars, Schweitzer gave participants, such as Finley, fraudulent monetary instruments. The United States has prosecuted and convicted Schweitzer of various crimes.

[2]    Numerous alerts existed regarding Schweitzer instruments including: (1) a Postal Bulletin Fraud Alert dated December 7, 1995; (2) an Office of the Comptroller of the Currency (OCC) fraud alert dated September 8, 1995; (3) an OCC fraud alert dated November 20, 1995; (4) a California State Banking Department weekly bulletin dated November 11, 1995, addressing Schweitzer's instruments; and (5) an OCC fraud alert dated February 8, 1996.

[3]    The evidence indicated that certain persons who previously presented Schweitzer's instruments to the IRS had received about $17,000 in refunds.

United States v. Finley, 301 F.3d 1000, 1002-04 (9th Cir. 2002).

## PROCEDURAL HISTORY

On July 7, 1999, a grand jury returned a five-count second superseding indictment charging Finley in case number 98-cr-460-WBS.  Count 1 of the indictment alleged that Finley submitted a false claim to the Internal Revenue Service, in violation of 18 U.S.C. § 287, based on his request for refund for overpayment of his taxes.  Count 2 alleged that Finley attempted to interfere with the administration of the federal tax laws, in violation of 26 U.S.C. § 7212(a), based on his submission of a fraudulent instrument to pay his taxes.  Counts 3 through 5 alleged that Finley committed bank fraud, in violation of 18 U.S.C. § 1344(a), based on two separate submissions of a $6 million fraudulent instrument to the Bank of America, and to his submission of a $150,000 fraudulent instrument to the holder of his mortgage.

On December 21, 1999, trial by jury commenced, and on January 5, 2000, the jury found Finley guilty of Counts 1, 2, 4, and 5.  On February 7, 2001, the Court sentenced Finley to 48 months in federal prison for each count, the sentences to be served concurrently, for a total of 48 months in prison.  At that hearing, the Court also dismissed Count 3.  Finley appealed to the Ninth Circuit.  Finley moved to be released on bail pending appeal, and the Court denied the motion.

Finley appealed his conviction and on August 20, 2002, the Ninth Circuit reversed, holding that the trial court had erred when it excluded the testimony of Dr. John J. Wicks, Finley's

5

proffered expert witness as to his mental state.   The case was

remanded for retrial.   The Ninth Circuit summarized pertinent

procedural history as follows:

>     On August 18, 1999, Finley's counsel filed notice
> under Fed. R. Crim. P. 12.2(b), informing the
> government that it intended to introduce testimony
> "relating to a mental disease or defect or any other
> mental condition" relevant to guilt.   The government
> made a discovery request for information about the
> expert testimony.   In response, on October 1, 1999,
> Finley's attorney sent a letter to the government
> summarizing the expert opinions of Dr. John J. Wicks.
> Dr. Wicks, a licensed clinical psychologist in
> California, had examined Finley.   This letter
> represented that Finley "has an atypical belief system,
> a system which is very rigid."   The letter also stated,
> "While Mr. Finley presents some indications of Shared
> Psychotic Disorder (Folie a Deux), Dr. Wicks does not
> at present make that diagnosis.   Mr. Finley is not
> suffering under any mental condition which is reported
> in the DSM IV [The Diagnostic and Statistical Manual of
> Mental Disorders, 4th Ed., 1994]."
>     In a second letter dated October 25, 1999,
> Finley's counsel once again represented their intent to
> call Dr. Wicks at trial.   In pertinent part that letter
> reads, "Mr. Finley's mental condition, as set forth by
> Dr. Wicks, will be presented at trial to show that Mr.
> Finley did not have the intent to defraud, the
> requisite mens rea for the crime..."   Thereafter, the
> prosecution moved under Fed. R. Evid. 704 to preclude
> Finley from relying on expert mental health testimony
> at trial.   At the hearing on the motion, neither party
> sought an examination of the psychologist to qualify
> that testimony under the *Daubert/Kumho Tire* [*Daubert v.
> Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *Kumho
> Tire v. Carmichael*, 526 U.S. 137 (1999).] requirements.
> The government's contention was that Fed. R. Evid.
> 704(b) barred the testimony because it addressed an
> honestly-held "value system."
>     The court ruled that Dr. Wicks' testimony would be
> admissible and expressed its understanding that Dr.
> Wicks could not testify about any element of the crime
> charged.   The court then advised counsel: "Then I think
> the way to handle it is to be careful on examination
> and to make appropriate objections, Mr. McKeon [the
> prosecutor].   If a question is asked that you feel

calls for Dr. Wicks to express an opinion about Mr. Finley's actual belief or the sincerity of those beliefs, you may object. And then if he blurts it out, move to strike, and I'll strike it." Additionally, the court instructed Finley's counsel to meet with Dr. Wicks to "make it clear to him the areas that he's not supposed to go into . . . so he has to stay within the bounds of the Court's ruling on what's relevant."

The parties proceeded to trial and the defense called Dr. Wicks. Dr. Wicks explained his thirty years of experience in psychology including his extensive experience in conducting psychological evaluations of patients. He stated that he spent two days with Finley, including administering a battery of psychological tests and interviewing him. As a result of the tests and examination, Dr. Wicks testified that Finley has an atypical belief system. Dr. Wicks explained that most people have an open belief system which is subject to change but some people have closed belief systems. Closed belief systems are more abnormal because they are fixed and rigid. Dr. Wicks then testified how an atypical belief system operates. Dr. Wicks testified: "It's a closed belief system in which practical - or information from the real world that comes in is so grossly distorted that the person ends up with a belief system that the average person in the culture just simply would sit back and say, 'Huh? How can you believe that?' If X, Y, and Z doesn't fit with that, they would then come up with an explanation how X, Y, and Z fit just fine with their belief system."

Dr. Wicks explained that a delusion is another psychological term for an atypical belief system and he stated there are three major categories of delusions. Dr. Wicks opined that Finley was vulnerable to a delusional disorder in December 1995, stating: "He tends to hear what he wants to hear and believe what he wants to believe about someone. So this had happened even prior to 1995." The doctor concluded that Mr. Finley suffered from a delusional disorder from a minimum of 1995 until the present. He elaborated that a person with a delusional disorder can be dissuaded from the delusion "only with tremendous, tremendous difficulty."

At this point, the government objected to Dr. Wicks's testimony and moved to strike it as a discovery violation. After extensive discussion with counsel for both parties, the court expressed the view that defense counsel had sandbagged the prosecutor and the court.

7

Then the court decided to conduct a *Daubert* hearing
that afternoon before proceeding with trial.
. . .

At the conclusion of the *Daubert* hearing, the
district court ruled from the bench.  The court
excluded the testimony on two grounds.  It indicated
that either ground was sufficient to exclude the
testimony.  First, under Fed. R. Evid. 702 the court
ruled that "the testimony would not be helpful to the
jury."  The court indicated that the jury could
independently determine Finley's credibility.  The
second ground for excluding the evidence struck the
testimony as a sanction for a Fed. R. Crim. P.
16(b)(1)(C) violation.

*Finley*, 301 F.3d at 1004-07 (citations and footnotes omitted,

italics in original).  After remand, Judge Shubb, on whose

personal property Finley had recorded liens after the trial,

recused himself and the case was reassigned to Judge Levi.

Finley and the government waived their rights to trial by

jury.  After a four-day bench trial, the Court acquitted Finley

of all charges on April 1, 2004.  The Court found, in relevant

part, as follows:

The Cheek case from the Supreme Court [United
States v. Cheek, 498 U.S. 192, 202 (1991)] is what
dominates this area of the law, and it's not a case, I
will tell you, that I am fond of.  I don't truly think
that I agree with it.  I recall when it came out it
concerned me a great deal.
But I will follow it, Mr. Finley.  I do not
practice nullification.  Nullification is a two-way
street.  It's the rule of law that we live by here.  It
is that rule that protects individual freedom, it
protects order, and it protects you.
So the fact that I disagree with the Cheek case is
of no moment, because I've taken an oath to uphold the
law, and that is the law.
. . .
[Y]ou've asked me repeatedly over the weeks and
months earlier for a ruling on whether the warrants and

8

liens are valid.  I will tell you that these warrants
and liens are not valid.
         . . .
         There does appear to be something very like mental
illness at work here in Mr. Finley's activities
concerning these warrants.  Otherwise, I can't truly
explain to myself what happened here.
         After close consideration, I do have a reasonable
doubt under Cheek as to the willfulness of the
defendant's conduct.
         As to the bank fraud counts, I also have a
reasonable doubt that any banker would reasonably be
influenced to part with money by relying on these
patently false instruments.  In fact, both banks here
immediately rejected them.
         Therefore, I acquit Mr. Finley of all counts
against him.

Transcript of Verdict at 4-6, United States v. Finley, No. 98-460

(April 1, 2004).

On July 11, 2007, Finley filed a claim in the U.S. Court of

Federal Claims, pursuant to 28 U.S.C. § 1495, alleging his unjust

conviction and imprisonment.  The Court of Claims advised Finley

that he must first obtain a Certificate of Innocence from the

court that convicted him.  He then filed a request for such a

certificate from this Court on July 26, 2007.  On September 12,

2007, the Court of Claims stayed the case until this Court grants

or denies a Certificate of Innocence pursuant to 28 U.S.C. §

2513.


**LEGAL CONTEXT**

28 U.S.C. § 1495 creates a cause of action providing

indemnification for those persons who, although actually innocent

of the charges brought against them, have suffered a deprivation

of their liberties by being unjustly convicted and imprisoned by the federal government.

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim for damages by any person unjustly convicted of an offense against the United States and imprisoned.

28 U.S.C. § 1495.

28 U.S.C. § 2513 sets out specific prerequisites which must be met in order to maintain this cause of action, providing:

> (a) Any person suing under section 1495 of this title must allege and prove that:
> (1) His conviction has been reversed or set aside on the ground that he is not guilty of the offense of which he was convicted, or on new trial or rehearing he was found not guilty of such offense, as appears from the record or certificate of the court setting aside or reversing such conviction, or that he has been pardoned upon the stated ground of innocence and unjust conviction and
> (2) He did not commit any of the acts charged or his acts, deeds, or omissions in connection with such charge constitute no offense against the United States, or any State, Territory or the District of Columbia, and he did not by misconduct or neglect cause or bring about his own prosecution.
>
> (b) Proof of the requisite facts shall be by a certificate of the court or pardon wherein such facts are alleged to appear, and other evidence thereof shall not be received.

28 U.S.C. § 2513.   The effect of these sections is to require that the trial court must issue a Certificate of Innocence before a § 1495 action can be maintained, and that the trial court has the responsibility to decide whether the prerequisites of § 2513 have been met before such a Certificate can be issued.

28 U.S.C. § 1495 is akin to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671 et seq., in that it waives sovereign immunity and creates a cause of action against the government for what is much like the tort of false imprisonment. This cause of action and its requisite Certificate of Innocence is a "quintessentially civil action" whose purpose is to provide for a suit against the government for damages caused by an unjust conviction and imprisonment.  See Betts v. United States, 10 F.3d 1278, 1283 (7th Cir. 1992).  The Seventh Circuit further described the civil nature of a Certificate of Innocence proceeding by likening it to the "independent inquiry" to set aside or correct a sentence under 28 U.S.C. § 2255.  Id.

The history of the Certificate of Innocence petition and the intent behind the § 1495 cause of action are thoroughly discussed in United States v. Keegan, 71 F. Supp. 623 (SDNY 1947).  Judge Barksdale made the following findings about the procedural requirements for a certificate of innocence:

> The fact that this duty has been imposed upon the trial court, would create the inference that the court would rely primarily on the record of the trial of petitioner had therein.  It would seem that other relevant facts could be presented by affidavit. . . .  It would seem that rarely would it be necessary for the court to take oral testimony, but I can see no objection to such procedure should it seem advisable.

Id at 637-38.  Proceedings for a Certificate of Innocence, then, contemplate that the District Court will review the existing

11

record, permit the parties to present new relevant evidence and essentially conduct a bench trial on the issues raised.

As in any civil case it would appear that the burden of proof is on the plaintiff.  As the <u>Keegan</u> court observed, the claimant

> . . . is the moving party, who asks the court to find and certify a fact.  It would seem to me obvious that the burden is on the petitioner at least to the extent that the court should not grant the certificate unless it is satisfied from the record before it that petitioner is altogether innocent.

<u>Id</u> at 636.  The Court does not believe, however, that Finley must prove his case beyond a reasonable doubt.  This request concerns a criminal case, but is not a criminal case itself.  In similar FTCA and § 2255 cases the plaintiff's burden of proof is by a preponderance of the evidence.  The Court believes that should also be the case in this § 2513 proceeding.  <u>Cf</u> <u>Griffin v. Sardella</u>, 253 Cal. App. 2d 937, 939 (1967)(negligence actions) and <u>Hearn v. United States</u>, 194 F.2d 647, 649 (7th Cir. 1952)(§ 2255).

## DISCUSSION

Finley has met one of the threshold requirements of § 2513 for § 1495 relief in that the conviction that led to his imprisonment has been reversed and remanded, and on retrial he has been acquitted.  Under our system, however, the result of this retrial is that he has been found to be not guilty, but he

has not been found to be innocent.   That distinction was
recognized at the time this cause of action was created.
Attorney General Homer Cummings wrote the Senate Judiciary
Committee considering the bill, that:

> . . . reversals in criminal cases are more frequently
> had on the ground of insufficiency of proof or on the
> question as to whether the facts charged and proven
> constituted an offense under some statute.
> Consequently, it would be necessary to separate from
> the  group of persons whose convictions have been have
> been reversed, those few who are in fact innocent of
> any offense whatever.

Letter to Chairman Henry F. Ashurst (May 7, 1935).   Under this
system, the trial judge in this case has ruled that the
government failed to meet its burden to prove willfulness beyond
a reasonable doubt, not that Finley was innocent.   At the trial
the government was required to prove, as an element of the crime,
that as a matter of fact Finley had a guilty state of mind.   They
failed to meet their burden of proof on this issue.   In this
proceeding Finley must address the same issue and prove as a
matter of fact that he had an innocent state of mind.   He must
meet his burden of proof on this issue.


A.   Innocence

     The central factual question in this proceeding is the same
as it was in the previous trials - what was Finley's state of
mind at the time of his conduct?   Virtually all the historical
facts in the case are undisputed: Finley's long-term experience

13

and success in running his own law-related bookstore business;
Finley's goal to expand this business; Finley's sojourn to
Montana and his meeting with Leroy Schweitzer; what he was told
by Schweitzer; the specific documents he was given; what he did
with those documents - there are no factual disputes about these
matters.  It appears that the only significant evidentiary
dispute is based upon the differing opinions offered by the
expert mental health professionals.  Finley's expert, Dr. John J.
Wicks, examined him and concluded that he has an abnormal mental
condition - an "atypical belief system" that is "fixed and
rigid."  The government expert, Dr. Bruce Walter Ebert, also
examined Finley and concluded there was nothing abnormal about
him, also pointing out that the current "bible" for mental
disorders, the Diagnostic and Statistics Manual, DSM IV, does not
include any reference to an "atypical belief system" as a mental
disorder.  Resolving this particular factual dispute, however,
will not resolve the case itself as Finley's belief system,
whatever it may be, does not tell us the content of his beliefs.

　　　　Crimes are composed of both an act and an intent, and that
is the case here.  Finley has in fact acted in a way that could
be criminal, but his act is lawful or unlawful depending upon his
accompanying state of mind.  To be guilty of a crime Finley must
act willfully, that is with a belief that the instrument he is
presenting for payment is in fact fraudulent, that it is not a
valid financial instrument.  In the applicable legal context as

14

set forth by the U.S. Supreme Court in the <u>Cheek</u> case, the judge in his bench trial found that the government had not met its burden to prove beyond a reasonable doubt the fact that Finley acted with a willful state of mind.

In the <u>Cheek</u> case, John Cheek, a commercial airline pilot, was indicted on charges of failure to file and of evading his income taxes.   <u>Cheek v. United States</u>, 498 U.S. 192, 193-94 (1991).   The government was required to prove that his conduct was willful.   <u>Id</u> at 193.   Cheek maintained that he had a good faith belief that these income tax laws did not apply to him.   <u>Id</u> at 196.   He was convicted by a jury that had been instructed by the trial court that willfulness was the voluntary and intentional violation of a known legal duty, and that an honest but unreasonable belief is not a defense.   <u>Id</u> at 197-98.   The Seventh Circuit affirmed the conviction explaining that a good faith misunderstanding negates willfulness only if it is objectively reasonable.   <u>Id</u> at 198.   The Supreme Court disagreed with the Seventh Circuit and reversed, holding that in a case where the fact finder believes that the defendant's claim of a good faith belief is true, then the government has not proved willfulness however unreasonable that belief may be.   <u>Id</u> at 201-04.

<u>Cheek</u> untethers reasonableness and willfulness.   They are different issues to be decided separately.   Conduct found to be unreasonable can, at the same time, be found to be conduct which

15

has been carried out lawfully in good faith.  Although his
general verdict did not include a specific finding on
reasonableness, it is apparent that this troubled Judge Levi.  No
matter how unreasonable Finley's conduct may have been, the
government was separately required to prove that it was
criminally willful, and he concluded that they had failed to meet
their burden of proof on that issue.

In this proceeding, Finley has the burden of proving his own
innocence.  It would appear that the <u>Cheek</u> rule applies here
also.  Whether or not one is willful remains untethered from
whether or not one is reasonable.  Finley can be found to be
innocent whether he is reasonable or unreasonable.  As it could
in deciding guilt, a fact-finder can consider reasonableness in
deciding innocence, but it is an evidentiary factor only.  The
finder of fact must make separate decisions on the ultimate
question of the state of mind that determines guilt or innocence.

This Court is the fact-finder for the purposes of this
petition.  To make the record clear, the Court finds on this
evidentiary record that Finley's conduct was objectively
unreasonable.  A reasonable person returning from Montana with
the paper instrument given to him by Schweitzer would not believe
that this piece of paper created the lawful authority to require
the Bank of America to put $6 million into his personal account.
The Court has already discussed the testimony about Finley's
"atypical belief system" and noted that whether or not Finley has

16

such a belief system does not tell us whether or not he acted willfully.   Finley could return from Montana and believe that he was given a document worth $6 million or he could believe that in reality the document was worthless.   It may be that he is fixed and rigid about whichever belief he chooses but that does not compel him to accept one belief or the other.

The ultimate question for the Court is whether or not Finley has proven that he is innocent.   As already noted he can be found to be both unreasonable and innocent, but he still has to prove the fact of his innocent state of mind.   The fact that he has acted unreasonably does not resolve that question but it obviously offers little or no support to his argument that he is innocent.

In each of his trials Finley maintained that he believed the documents were valid negotiable instruments when he passed them to the bank, the IRS, and his mortgage-holder.   In this proceeding Finley maintains that he still believes they are valid.   This month Finley filed another in pro per brief.   In this brief he argues that an exhibit called "Public [sic] Contract and the UCC," which he has already filed with the Court, proves that the warrants of LeRoy Schweitzer are valid.   This exhibit is a 26 page treatise on negotiable instruments and the Uniform Commercial Code by someone, described in the exhibit as "Douglas Leiter, J.D."   There is no further information about the source of the exhibit; it contains no discussion of the

17

Schweitzer warrant; and its text clearly does not prove that the warrants are valid.  It is troubling to the Court that even after he has been rejected in every instance where he has tried to negotiate these documents, and even after Judge Levi, in response to his repeated requests, specifically told him that they were invalid, that in this proceeding, Finley would tell this Court that it is his personal state of mind that these warrants are valid.

The latest brief also endeavors to answer an argument by the government that he did not believe the warrants were valid.  In his testimony at the first trial Finley was asked whether his knowledge about Schweitzer's arrest raised any doubts in his mind about the validity of the warrants.  Finley answered by saying, "I would imagine it probably did raise questions in my mind, and I did it anyway."  Finley argues that this does not show doubts in his mind, but rather that he was actually explaining that the government had produced no evidence or proof that the warrants were invalid.  Asking for proof of validity is something Finley has focused on since he first obtained the warrants.  In assessing the significance of this focus as to Finley's state of mind, it should be noted that trying to find whether or not there is proof of the validity of the warrants is the same as trying to find the answer to the question of whether or not the warrants are valid.  There would also seem to be a question as to whether Finley's asserted search for proof was bonafide.  As we have

already seen, whenever he has been presented with proof of
invalidity he has refused to acknowledge it.

Finley also maintained that none of his conduct could be
described as fraudulent as he had simply presented the warrants
as is and made no misrepresentations about them.  He maintains
that under these circumstances, if the warrant recipient simply
turned the warrant down there would be no harm to the recipient,
no deceit on his part, and therefore no fraud committed.  An
implicit premise of this statement is that 'even if I believe the
warrants are invalid there will be no harm or deceit if I simply
present them and they are turned down.'  The Court has difficulty
interpreting the paradox of Finley's arguments - that he believed
in the warrants validity but simultaneously believed the
financial institutions were free to turn them down - as anything
more than an expression of doubt on this issue.

Trying to discover an explanation for Finley's conduct in
this case, trying to ascertain the truth as to his state of mind
when he carried out that conduct, has proven to be a difficult
and elusive quest.  It is Finley's burden to answer these
questions.   The burden of proof in this case is not beyond a
reasonable doubt, but it is still a burden of proof that must be
met.   On this record the Court finds that, just as the evidence
is not sufficient to show the existence of a willful state of
mind, it is not sufficient to show that a willful state of mind

19

did not exist, and that the petitioner has not met his burden of proof and has not established that his conduct was innocent.

B.   <u>Neglect</u>

There is another, separate reason for denying a Certificate of Innocence to Finley.  As already cited, 28 U.S.C. § 2513 provides that a Certificate can not be granted unless the plaintiff can establish that "he did not by misconduct or neglect cause or bring about his own prosecution."  § 2513(a)(2).

As the Seventh Circuit observed in <u>Betts</u>:

> the statute expressly requires a causal connection
> between petitioner's conduct and his prosecution; it
> does not preclude relief simply because the petitioner
> engaged in misconduct or neglect, period.

10 F.3d at 1285.  A defendant's action constitutes neglect or misconduct where he:

> has it within his means to avoid prosecution but elects
> not to do so, instead acting in such a way as to ensure
> it.  In that sense, he is responsible for his own
> prosecution and deserves no compensation for his
> incarceration.

<u>Id</u> at 1285.

Each of the crimes charged in this case require that the accused defendant carry out an act of presenting a document for payment.  Finley did in fact commit those acts knowingly and intentionally.  But, as we have seen, commission of those acts does not in and of itself establish that a crime has been

committed.   There must be an accompanying culpable state of mind
of the actor.

A culpable state of mind cannot be established by the
percipient witness testimony of another person but must be
established by a set of circumstances that provide a permissible
and persuasive inference of that culpable state of mind.   Finley
chose to commit the act when he was aware of a set of
circumstances that would permit such an inference, a set of
circumstances that would permit a fact finder to find
willfulness.

Moreover, the set of circumstances supports a finding that
his acts were objectively unreasonable, which is to say that he
had at least a negligent state of mind when he acted.   Cheek does
not effect this conclusion as it cannot untether reasonableness
and negligence.   Whether or not one is negligent is defined by
whether or not one acts reasonably.   Unreasonable conduct is the
essence of negligence.   See Ramirez v. Plough, 6 Cal. 4th 539,
546 (1994).

> A person is negligent if he or she does something that
> a reasonably careful person would not do in the same
> situation or failed to do something that a reasonably
> careful person would do in the same situation.

1-400 CACI 401 (Judicial Counsil of California Civil Jury
Instructions, 2008).

Under the circumstances it would appear that Finley acted
through neglect and he has not proven that he "did not by . . .

21

1   neglect cause or bring about his own prosecution," as required by

2   § 2513.

3

4                               **CONCLUSION**

5        For the foregoing reasons, the Court denies Finley's

6   petition for a Certificate of Innocence.  Finley did not meet his

7   burden of proof that the acts he committed were not accompanied

8   by willfulness.  In addition, he did not prove that he did not

9   bring about his own prosecution by his own neglect.

10

11       IT IS SO ORDERED

12

13  Date: June **23**, 2008          By _____

14                                   D. LOWELL JENSEN

15                                   United States District Judge

16

17

18

19

20

21

22

23

24

25

                                    22